<hr>

## PEOPLE v. CURRAN.

(Supreme Court, Appellate Division, First Department.   March 6, 1896.)

ASSAULT AND BATTERY—SUFFICIENCY OF EVIDENCE.

> Prosecuting witness testified that he was assaulted by defendant in the latter's saloon, where he had been drinking, and that he had taken eight or nine drinks while there. It was shown that there were several other saloons near defendant's place, and another witness stated that he saw him pushed by defendant from the door of a saloon, but gave a location not that of defendant's saloon. Defendant and his bartender and several other unimpeached witnesses testified that he was not in the saloon at the time alleged, and others testified that prosecuting witness had a fight on the street on that morning, which would account for his wounds. *Held*, that a conviction was against the weight of the evidence.

Appeal from court of special sessions, New York county.

Thomas Curran was convicted of assault in the third degree, and appeals.   Reversed.

Argued before VAN BRUNT, P. J., and BARRETT, RUMSEY, O'BRIEN, and INGRAHAM, JJ.

R. J. Haire, for appellant.
John D. Lindsay, for the People.

O'BRIEN, J.   The defendant was convicted of assault in the third degree in having beaten the complainant, a colored man, in the defendant's saloon, on West street, on the morning of Tuesday, July 16, 1895.   That the complainant was assaulted and badly cut and maltreated was established beyond doubt; but whether it was done by the defendant in his saloon is the crucial question.

The complainant testified as follows:

"I do not know whether the number of the place that I went into on the 16th of July was 286 West street. * * * It was one o'clock Tuesday morning.   I stayed in there until five o'clock. It was on West street, next door to a lodging house. * * * I went up to the bar, and got a drink. * * * Some one came and knocked on the door, and told him to stop the fuss in there.   The bartender was behind the bar.   The defendant was not behind the bar, but he was in the place. I saw him behind the bar twice during the time I was in there.   This cop knocked on the door, and told him to stop the fuss.   He turned the light down very low.  They were all shaking dice.   I went to go out.   He said, 'Wait awhile; you cannot get out; the police are at the door.' He let none in or out.   There were six of us in there.   I started to go out. The gang told us to go back, and get into the game.   I was pulled back to chuck dice with them.   The first round of drinks I was stuck for it.   I paid for it, and said nothing.   This was between one and two o'clock.   Some drank

whisky, and some drank beer. * * * I spent about four dollars in there after I was stuck. In the morning I was starting to go out, and I was pulled back, and told to pay for a round of drinks. I said I did not owe for a round of drinks. They said I did. I said I did not. A couple of them took me, and carried me back to the bar. I thought it was better to pay for it. I paid for it, and after that I started to go out again. That was near five o'clock then, as near as I can judge. I did not pay particular attention to the clock. I paid for the drinks, and I started to go out again. When I went to open the door to go out, I was stopped."

Upon cross-examination he said:

"I do not remember exactly how many rounds of drinks I had there. I had about eight or nine rounds of drinks. I do not think I had more than that. * * * There were five or six people in the saloon. The defendant was there all the time."

One Johnson was called for the people, and testified:

"It was about five o'clock in the morning. I saw him thrown out of the liquor saloon. The saloon was on West street, between Watts and Desbrosses streets."

A police officer was examined, who stated that he was connected with the steamboat squad, and that the station house is on West street, near Canal, right opposite Mr. Curran's place, which is a liquor store. "That is 268 West street, and is a licensed saloon. * * * It is between Canal and Watts streets, and not between Watts and Desbrosses. * * * It was six o'clock when I came there."

It will be noticed that the testimony of the witness Johnson was in direct conflict with that of the officer, both as to the time and as to the location of the saloon; and in this condition of the record it was deemed proper to recall Johnson, who then stated that, when he said on his direct examination that the saloon he saw the complainant coming out of was between Watts and Desbrosses, it was a mistake; that the saloon was between Canal and Watts streets; and that it had an awning over it, with the name of the defendant printed on the awning. And that there was such an awning with the defendant's name on it in front of the latter's saloon was proven by the officer, who also testified that, in addition to the defendant's, there was a saloon in the middle of the block, kept by one Hart, and "McMann's is alongside of Hart's." And, in addition to these, he testified that there was a liquor store on the corner.

This was practically all the testimony for the people as to the person who committed the assault, and as to the time and place the assault was committed; and the defendant's counsel moved for the acquittal of the defendant on the evidence before the court, which was denied, and an exception taken.

Without adverting to the weakness of the case thus made out as against the defendant, we would briefly summarize the testimony on behalf of the prisoner. The latter himself took the stand, and swore positively that he never saw the complainant until he came with the officer on Tuesday morning, at 6 o'clock; that, on the evening preceding, he had left the saloon about half past 10 or 11 o'clock; that he lived upstairs in the house over the saloon, where he went to bed, and did not leave his room until about 6 the next

morning; that, when he retired, he left his bartender, a man nam-
ed O'Regan, in charge of the saloon; and that, on coming down
in the morning, he opened the store, and a few minutes after, and
while engaged in sweeping out and cleaning up, preparatory to
opening it for business, he saw the complainant, who came in with
an officer, and arrested him.    The bartender testified that he could
not tell exactly when the defendant left the saloon on Monday even-
ing, but it was between 10 and 11 o'clock, and that he was in
charge, and remained there that night, until he closed up, and took
the key of the store upstairs to the watchman of the lodging house
which was over the store, and that this was in the neighborhood of
about 1 o'clock.    One Bloom, who was keeper of a lodging house
for Curran, or a night clerk, remembered the barkeeper's, O'Re-
gan's, handing him the key on Monday night, and the time when
it was handed him, about 1 o'clock; and that the first person he
gave the key to, after O'Regan gave it to him, was to the de-
fendant, about five minutes to 6 on Tuesday morning, when he went
in and woke him up, which, it appears, it was his custom to do
every morning.    Another witness, named Donohue, who said he
was in the milk business, testified that he served Curran's saloon
with milk, and also other customers in that house, and that he got
to that place on Tuesday morning, about five minutes to 6 o'clock,
and waited until about ten minutes past 6, when he saw Mr. Curran
come down with his vest on his arm and his key in his hand, when
he delivered him the milk.    The court thereupon recalled the offi-
cer, who said it was three minutes past 6 when he made the arrest,
and that when he went there, and asked the defendant why he as-
saulted the complainant, he at once said, "I did not hit him." But,
upon the complainant's saying he did, he arrested him, and took
him to the station house.    Subsequently, the officer was again re-
called, and said that he found the complainant's shoe outside of
the saloon; that he was sober, and that he noticed Curran's ap-
pearance, and he was sober, and he could not tell that he looked
as if he had been in a fight; that "his condition was the same as a
man who would be behind a bar.    He had no jacket or apron on.
His clothes were not torn.    There was no blood on his hands that
I saw.    *    *    *    I did not see any blood in the saloon.    The blood
was outside of the saloon, where he (referring to the complainant)
had been sitting, and all along the sidewalk to Watts street. *    *    *
The trail of blood led from Watts street to the store." The wit-
ness Johnson was recalled, and went over his former testimony,
only adding that he saw the defendant give the complainant a
shove out of the saloon, out of a side door; that he did not see any
individual strike the complainant; that he did not see O'Regan,
the barkeeper, there.    The complainant, however, on further cross-
examination, testified that O'Regan was there on that night, but
that he was not the one attending to the bar; that he had no
trouble out on West street with a man named Kelleher, who was
in court, and whom he identified as one of those in the saloon that
night; that, after he had been thrown out, he saw Kelleher, did
not have a fight with him on the corner, but that Kelleher invited him

to come in and wash the blood off, and, when he refused, Kelleher struck him, and kicked him again. "I did not have any fight with him. He struck me, and sneaked inside again." Kelleher was called, and stated that, going along West street that morning, he was accosted by complainant, who demanded a drink, and called him some vile name, and got hold of him by the coat, and threw him down, and struck him, whereupon Kelleher struck the complainant; that they clinched, "and he got kind of the best of me in the clinch. I got up in self-defense, and hit him in defending myself." The witness Murphy, who said he was a laborer on pier 36, testified that, on that morning, he saw the complainant and Kelleher fighting, and that it was about 20 minutes to 6 o'clock that it occurred.

We have thus summarized the entire evidence for the purpose of showing the inconsistencies in the statements made by the complainant and his witness as to the time and place of the occurrence, and the number of witnesses, whose testimony, if at all credible, entirely outweighs and destroys the force and effect of any inferences to be drawn in favor of the view that the complainant was assaulted by the defendant in his store on that morning. In this connection it must be remembered that the trial took place on the Friday succeeding the date of the alleged assault, so that the facts were fresh in the memory of all. There was no effort made to impeach any of the witnesses for the defendant, all of whom, though poor, seemed to be credible men; and, on the part of the complainant, we have the fact that he himself testifies to having been engaged in a game of dice from 1 to 5 o'clock in the morning, and to having had, at least, eight or nine drinks during that time; and we must take this into consideration in determining how far we should credit his statement that he was perfectly sober, and therefore able to tell exactly how and in what manner he was assaulted. The other witness for the people, who was also a colored man, says that, from the time the defendant shoved the complainant out of the door, no other person interfered with him. This, however, is contradicted by the complainant himself, who says that he was invited back by Kelleher to wash the blood off his face, and that, upon refusing, Kelleher went out, and struck him, and then "sneaked back," as he terms it, into the saloon; and this is directly contradictory of the complainant's witness' story that he saw no one strike the complainant, and that no one without his seeing it could have struck him after he was shoved out of the store.

Upon the question of time the defendant is also supported by the probabilities. If the complainant received his injuries at 5 o'clock in the morning, no explanation is furnished why it took until 6 o'clock to obtain an officer, when, according to the latter's testimony, the station house was directly opposite the defendant's saloon, or why the plaintiff, after being so assaulted, should have remained in the immediate vicinity during all that period. We think the testimony shows either that the complainant was injured in the fight on West street, in the manner detailed by two of the defendant's witnesses, or, if injured in a saloon, that he has confused the

identity of the defendant's with one of the two or three other saloons which were on the same block. However this may be, in view of the inconsistencies in the testimony of the witnesses for the people, and the strong defense which was presented by the defendant, not only supporting his denial of having been ·guilty of the assault, but consistent with such defense, we think that the evidence, unless we are to discredit entirely the sworn testimony of unimpeached witnesses, clearly preponderated in defendant's favor.

Upon the facts, therefore, we think the judgment was wrong, and that it should be reversed, and the prisoner discharged. All concur.